**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

CYDNI WARD

                                **CIVIL ACTION**

VERSUS

                                **NO. 22-220-JWD-SDJ**

FRANCISCAN MISSIONARIES OF OUR
LADY UNIVERSITY

**RULING AND ORDER**

This matter comes before the Court on the *Motion for Summary Judgment* (Doc. 16) filed by Defendant, Franciscan Missionaries of Our Lady University ("Defendant" or "FranU"). Plaintiff Cydni Ward ("Plaintiff" or "Ward") opposes the motion, (Doc. 18), and FranU has filed a reply, (Doc. 20). Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, Defendant's motion is granted, and all of Plaintiff's claims against Defendant are dismissed with prejudice.

I.    **RELEVANT FACTUAL BACKGROUND**

    **A. Introduction**

        *1. Plaintiff and Her Claims*

Plaintiff, Cydni Ward, was a student in Fran U's Physician Assistant Program ("PA Program") from January 2020 until her final dismissal in July 2021. (Def.'s *Statement of Uncontested Material Facts* ("*SUMF*") ¶ 1, Doc. 16-1.)[1] This case arises from Plaintiff's dismissal

---

[1] Local Civil Rule 56(c) requires a party opposing a motion for summary judgment to submit with its opposition "a separate, short, and concise statement of material fact" that "shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts. . . ." M.D. La. Civ. R. 56(c). "[U]nless a fact is admitted," the opponent's statement "shall support each denial or qualification by a record citation as required by this rule." *Id.* "Each such statement shall begin with the designation 'Admitted,' 'Denied,' or 'Qualified' and, in the case of an admission, shall end with such designation." *Id.* "Facts contained in a supporting or opposing statement of

from that program. Plaintiff brings claims against Defendant arising under the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*., on the basis of race, and under the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act, for discrimination and failure to provide a reasonable accommodation. (*Am. Compl.* ¶ 23, Doc. 3.)

### 2. *The PA Program: Overview*

In September 2005, FranU began offering a PA Program that provides a Master of Medical Science degree to its graduates. (*SUMF* ¶ 2, Doc. 16-1.) The PA Program is accredited by the Accreditation Review Commission on Education for the Physician Assistant ("ARC-PA"). (*Id.* ¶ 3.) Graduates of the PA Program are eligible to take the Physician Assistant National Certifying Examination ("PANCE") administered by the National Commission of the Physician Assistant ("NCCPA"). (*Id.* ¶ 4.) Licensed and Certified PAs can diagnose and treat patients, prescribe medications, and assist in surgery. (*Id.* ¶ 5.)

It is undisputed that the PA Program is a demanding program designed to promote critical thinking as well as clinical knowledge and skills necessary to exercise sound medical decision-making to provide a broad range of diagnostic and therapeutic services to patients. (*Id.* ¶ 6.) The PA Program is a 28-month program and consists of 108 credit hours. (*Id.* ¶ 7.)

The first four semesters (68 credit hours) of the PA Program make up the didactic phase. (*Id.* ¶ 8.) The didactic phase consists of more typical in-classroom and online lectures as well as

---

material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." M.D. La. Civ. R. 56(f).

Here, Plaintiff violated this rule. Ward submitted a *Plaintiff's Contested Issues of Material Fact* (Doc. 18-1) ("*PCIMF*"), but she does not specifically controvert, paragraph by paragraph, FranU's *SUMF*. Thus, all facts in FranU's *SUMF* shall be deemed admitted for purposes of this motion. However, the Court will take into account the evidence presented in *PCIMF*, along with the rebuttal evidence offered in Defendant's *Reply to [PCISM]* ("*DRPCISM*") (Doc. 20-1).

laboratories and patient simulations that provide a fundamental layer of knowledge for students to apply in the clinical setting. (*Id.* ¶ 10.)

The final three semesters of the PA Program (40 credit hours) are the clinical phase of the PA Program. (*Id.* ¶ 9.) The clinical phase includes hands-on training under the direct supervision of licensed physicians, physician assistants, and other healthcare providers. (*Id.* ¶ 11.)

Given the rigors and demands of the PA Program and the PA profession in general, FranU requires students to complete all coursework with a grade of "B" or higher and maintain a 3.0 (or calculated 80%) cumulative grade point average. (*Id.* ¶ 12.) No student may earn more than 2 "C"s at any time during his or her participation in the PA Program. (*Id.* ¶ 13.)

A PA student may be placed on academic probation in the following circumstances: (1) if his or her cumulative GPA falls below 3.0 (or 80% calculated) or (2) a 2nd "C" is earned during any phase of the PA Program. (*Id.* ¶ 14.) If a student is placed on academic probation after having earned 2 "C"s, the student will remain on academic probation for the remainder of the PA Program. (*Id.* ¶ 15.) A student will be dismissed from the PA Program if he or she earns a third "C." (*Id.* ¶ 16.)

### 3. *The PA Program: Reasonable Accommodations Generally*

In compliance with the RA and ADA, students with documented disabilities may request appropriate accommodations through the Office of Student Affairs. (*SUMF* ¶ 17, Doc. 16-1.) According to FranU, students must request accommodations for each semester they are enrolled in FranU; the accommodations do not continue automatically. (*Id.* ¶ 18.)

Reasonable accommodations are made for qualified students with disabilities. (*Id.* ¶ 19.) Accommodations that are not classified as reasonable by FranU are as follows: (1) any accommodation that poses a direct threat to the health and safety of others; (2) any accommodation

that makes a substantial change in an essential element of the curriculum or a substantial change in the services that are provided; or (3) any accommodation that imposes an undue financial or administrative burden on the University. (*Id.* ¶ 20.)

Each student in the PA Program must meet the Technical Standards of the profession and the PA Program in order to ensure patient safety and quality of care. (*Id.* ¶ 21.) One of the Technical Standards states:

> Cognition: The physician assistant program is a concentrated and fast-paced program. In addition, physician assistants must often make critical decisions when evaluating patients and must make these decisions in a timely manner. Students must be able to assimilate large amounts of information quickly and efficiently, as well as gather and analyze patient data in a timely manner. Health conditions and/or drugs (prescription, over the counter or "recreational") that alter perceptions, slow responses, or impair judgment are not compatible with success in the program. These may also affect the student's ability to obtain a license or to practice as a physician assistant.

(*Id.* ¶ 22.) For the clinical-based assignments in the didactic phase of the PA Program, some accommodations normally acceptable in the didactic classes (such as extended time on clinical-based assignments and a distraction-reduced environment) fundamentally alter the essential requirements and are not granted because they will compromise the PA Program's goals and standards. (*Id.* ¶ 23.)

As part of the licensing requirements for PAs, the licensing board requires an attestation from FranU that the graduate has the appropriate knowledge and skills needed for practice as a PA. (*Id.* ¶ 24.)

Ward knew that the PA Program was a tough program and that not all students who enter the PA Program will successfully complete the PA Program. (*Id.* ¶ 25.) Prior to Plaintiff's dismissal from the PA Program, at least one of her classmates had left the PA Program. (*Id.* ¶ 26.)

4

### B. Plaintiff's Time in FranU's PA Program

#### 1. Spring 2020: Plaintiff's Early Struggles in the PA Program

During Ward's New Student Orientation in January 2020, Ward was provided with the PA Program Handbook and completed an assignment which required the students to thoroughly review the handbook. (*SUMF* ¶ 27, Doc. 16-1.) During Ward's New Student Orientation in January 2020, Ward met with Dr. Sarah Deyo, who was the PA Program Director and Ward's faculty advisor. (*Id.* ¶ 28.) As her faculty adviser, Dr. Deyo formally met with Plaintiff each semester to discuss her progress in the PA Program. (*Id.* ¶ 29.)

At the conclusion of the Spring 2020 semester, Ward earned a "C" in PHAS 5740 Medical Anatomy and Neuroanatomy, her first "C" in the PA Program. (*Id.* ¶ 30.) At the conclusion of the Summer 2020 semester, Plaintiff earned a "C" as her final grade in PHAS 5731 Pharmacotherapeutics I, her second "C" in the PA Program. (*Id.* ¶ 31.) This brought her cumulative GPA to 2.939. (*Id.*)

On September 1, 2020, Dr. Deyo advised Ward via letter that she was being placed on academic probation because she earned her second "C" in the PA Program. (*Id.* ¶ 32.) The September 1, 2020 letter also informed Plaintiff that even though her current cumulative GPA was below 3.0, it was calculated as 84% on a 100-point scale, which is considered a "B" average. (*Id.* ¶ 33.) In the September 1, 2020 letter, Dr. Deyo advised Ward that she would be dismissed from the PA Program if she earned a third "C." (*Id.* ¶ 34.)

#### 2. Fall 2020: Plaintiff Requests an Accommodation

On September 18, 2020, Ward completed an "Accommodation Request Form" for the Fall 2020 semester, her first request for accommodation during the PA Program. (*SUMF* ¶ 35, Doc. 16-1.) The "Accommodation Request Form" contained the following acknowledgement:

> By completing this form, I acknowledge and understand that I am responsible for picking up my letter of accommodation and meeting with my instructors to notify them of all granted accommodations. I further understand that accommodations will not take effect until I have discussed the requests with my instructors and returned the initialed copy of the letter of accommodation to the Student Affairs Office

(*Id.* ¶ 36.) Ward's accommodation request was granted, and the letter of accommodation identified her accommodations as extended time on exams (1.5x) and a distraction-reduced environment for exams. (*Id.* ¶ 37.)

On October 26, 2020, Dr. Deyo and Plaintiff had an extensive Fall Mid-Semester advising meeting. (*Id.* ¶ 38.) During this meeting, Dr. Deyo told Ward that her exam grades across all Foundations of Clinical Medicine and Surgery courses were concerning and suggested a lack of individual foundational knowledge that correlates with safe patient care. (*Id.* ¶ 39.) Dr. Deyo strongly encouraged her to review the ExamSoft Strengths and Opportunities reports to identify current themes in her lower-performing areas and provided her with the reports. (*Id.* ¶ 40.) Dr. Deyo also advised Ward to focus on identifying specific knowledge gaps. (*Id.* ¶ 41.) During the October 26, 2020 meeting, Dr. Deyo advised Plaintiff that she had to meet all benchmarks the following semester to move to the clinical phase of the program. (*Id.* ¶ 42.) During this meeting, Dr. Deyo complimented Ward on being positive and professional. (*Id.* ¶ 43.)

At the conclusion of the Fall 2020 semester, Ward was informed that she would remain on academic probation based on the PA Program's two "C" policy. (*Id.* ¶ 44.)

### 3. *Spring 2021: Plaintiff's First Clinical Course*

Ward did not submit a New Accommodation Request Form for the Spring 2021 semester. (*SUMF* ¶ 45, Doc. 16-1.) Despite this, and although Plaintiff did not receive a letter of accommodation from the Student Affairs Office or discuss the letter with her instructors (as is

required each semester by FranU), Ward's "profile" in ExamSoft, the computer-based testing software, did not change, and Plaintiff was still afforded time and a half on her multiple choice examinations for the Spring 2021 semester. (*Id.* ¶ 46.)

Dr. Deyo was Ward's instructor for PHAS 5754 Foundations of Clinical Medicine and Surgery V. (*Id.* ¶ 47.) Because portions of this course were clinical in nature, rather than didactic, accommodations were not permitted by FranU. (*Id.* ¶ 48.) Ward understood that the purpose of this course was to equip students with the knowledge and clinical ability necessary to competently practice in a primary care setting. (*Id.* ¶ 49.) Regarding accommodations, the syllabus for PHAS 5754 Foundations of Clinical Medicine and Surgery V clearly stated:

> **Student Accommodations**
> This course is designed to evaluate the clinical and procedural competencies necessary for entry into the clinical phase of the program, and eventually entry-level PA practice. In order to achieve competency, each student must meet the Technical Standards of the program and the PA profession, which can be found on the college website. . . .
>
> **In the clinical phase, and in practice, the PA must be able to perform tasks, procedures, and made decisions in a variety of clinical settings with a finite amount of time, and often under stress. These abilities and behaviors have a direct effect on patient safety and outcomes. Therefore, accommodations such as, but not limited to: extended time, or distraction-free environment would create a substantial change in standard or [sic] practice and curriculum outcomes and potential [sic] result in patient harm, and therefore cannot be granted for [Observed Structured Clinical Examinations ("OSCEs")], Differential Diagnosis Exercises or History and Physical Documentation Exercises. Each accommodation request will be reviewed on its own merit by an Ad Hoc Committee of the Disabilities office.**

(*Id.* ¶ 50; *see also id.* ¶ 61 (defining "OSCE").)

According to Defendant, Ward was not afforded 1.5x time to complete the OSCEs, Differential Diagnosis Exercises or History and Physical Documentation Exercises and similar

clinical-based assignments in PHAS 5754 because (1) she did not make such request, and (2) based on the policy, such accommodation would amount to a fundamental change in the curriculum and would potentially lead to patient harm. (*Id.* ¶ 51) This course prepares PA students for real-time practice and critical decision-making, and the skills that are part of the Technical Standards. (*Id.* ¶ 52.) The Course syllabus states that it was imperative that PA students could successfully meet the benchmarks on clinical-based assignments within the time determined by the course instructor as that is what would be required in practice. (*Id.* ¶ 53; Def. Ex. A-6, Doc.16-4.)

Prior to PHAS 5754 Foundations of Clinical Medicine and Surgery V, all of Plaintiff's examinations were computer-based multiple choice examinations. (*SUMF* ¶ 54, Doc. 16-1 (citing Def. Ex. C at 58, Doc. 16-6).) One type of assessment in this course was "Differential Diagnosis," which was made up of 50 short answer questions. (*Id.* ¶ 55 (citing Def. Ex. C at 60, Doc. 16-6).) Ward understood that a differential diagnosis is part of a clinical assessment of a patient and part of the clinical analysis of a patient. (*Id.* ¶ 56 (citing Def. Ex. C at 59–60, Doc. 16-6).)

At the conclusion of the Spring 2021 semester, Ward earned a "C" in PHAS 5754, her third "C" in the PA Program. (*Id.* ¶ 57.) On April 28, 2021, the PA Program's core faculty committee met to discuss Plaintiff's failure to meet the PA Program's benchmarks and moved to dismiss Ward from the PA Program. (*Id.* ¶ 58.) In a letter dated April 29, 2021, to Ward from Dr. Deyo, Ward was notified of her dismissal from the PA Program after earning her third "C" – a 77 in PHAS 5754. (*Id.* ¶ 59.)

Plaintiff, meanwhile, contends that, by not providing extra time for this course, Defendant failed to provide a reasonable accommodation in violation of the ADA and Rehabilitation Act. (*See PCIMF* ¶ 6, Doc. 18-1 (disputed).) But the only evidence Plaintiff cites for this position in the *PCIMF* is Dr. Devo's testimony, wherein she said that Plaintiff was not given an

accommodation for her disability, without citing to what follows; Dr. Devo specifically stated that Plaintiff was not given an accommodation "[b]ecuase of the program and course policy that accommodations are not granted for clinical assessments, including OSCEs, OSLERs and history and physical exam documentation," which is consistent with the undisputed facts set forth above. (Pl. Ex. 1 at 155–56, Doc. 18-2.)

Plaintiff also complains that she was allowed more time for some multiple-choice tests but not on essay and short answer tests which she needed, but Plaintiff herself testified that, prior to PHAS 5754 Foundations of Clinical Medicine and Surgery V, all of her tests were multiple choice. (Def. Ex. C at 58, Doc. 16-6.) Again, Defendant maintains that these courses were treated differently than PHAS 5743 because PHAS 5743 was clinical in nature rather than didactic, so additional time was not allowed. (*See SUMF* ¶¶ 47–51, Doc. 16-1.)

### 4. *Plaintiff's Various Appeals and Final Accommodation*

On May 6, 2021, Plaintiff submitted a formal grade appeal of her grade in PHAS 5754 Foundations of Clinical Medicine and Surgery V. (*SUMF* ¶ 60, Doc. 16-1.) In her appeal, Ward noted that she had a documented disability and was granted accommodations by the Office of Student Services. (*Id.* ¶ 61.) Ward stated in her appeal that (1) per the course syllabus, she was not granted accommodations for the OSCEs; (2) she was not granted the opportunity to repeat OSCEs as provided in the syllabus; (3) she was not advised of her rights of appeal or remediation; and (4) she was not provided a grading rubric for the OSCEs although the course syllabus said that one would be provided. (*Id.*)

Because Dr. Deyo was the Program Director (the individual who would typically review a grade appeal) and course instructor, Dr. Alicia Bates, Program Director for FranU's Nurse Practitioner Program, was asked to review Ward's grade appeal. (*Id.* ¶ 62.) After reviewing the

syllabus, assignment rubrics, and PA handbook, Dr. Bates denied the grade appeal and supported a grade of 77%. (*Id.* ¶ 63.) Dr. Bates advised Plaintiff that if she wanted to proceed further with the grade appeal, she must forward her appeal to Dr. Susan Steele-Moses, then Dean of FranU's School of Health Professions. (*Id.* ¶ 64.)

On May 11, 2021, Ward escalated her grade appeal to Dr. Steele-Moses. (*Id.* ¶ 65.) Dr. Steele-Moses reviewed Plaintiff's appeal and supporting documents, including all examinations, assignments, written work, simulated assessments, and clinical documentation, OSCE and OSLER clinical scenarios, and Dr. Deyo's gradebook. (*Id.* ¶ 66.) In her review of the entirety of the documents, Dr. Steele-Moses noted that two of the three exams fell below the 80% benchmark, two of the three mini-OCLERs fell below the benchmark, both H&P assignments fell below the benchmark, and four of the six differential diagnosis assignments fell below the benchmark. (*Id.* ¶ 67.) Dr. Steele-Moses could not find any incongruence with the PA Program policies or the course syllabus and Ward's grade. (*Id.* ¶ 68.) Dr. Steele-Moses denied the grade appeal. (*Id.* ¶ 69.)

While the PA Program handbook does not have a procedure in place for appealing a dismissal, Ward submitted her appeal of her dismissal from the PA Program to Dr. Deyo. (*Id.* ¶ 70.) By letter dated May 25, 2021, Dr. Deyo advised Ward that the PA Program's core faculty committee reviewed her request to appeal her dismissal and did not grant her request. (*Id.* ¶ 71 (citing Def. Exs. A, A-10, Letter from Dr. Deyo to Plaintiff dated May 25, 2021).) Dr. Deyo informed Ward that she could advance her appeal to Dr. Steele-Moses, which she did. (*Id.* ¶ 72.)

In an effort to assist Ward and give her every opportunity to succeed in her PA career path, in a letter dated May 28, 2021, following a Zoom meeting with Ward on May 27, 2021, Dr. Steele-Moses informed Ward that she would be given the opportunity to continue in the PA Program upon meeting the following conditions:

1. You will repeat the essential requirements set forth in PHAS 5754, as deemed necessary by the Program Director, whether you passed them or not.

2. Your Program Director, Dr. Deyo, will contact you the week of June 14, 2021, to assign a full time faculty member who will work with you during PHAS 6000.

3. You will register for PHAS 6000, a Pass/Fail course, at your own expense.

4. You will meet with the assigned faculty member to review and sign the learning contract and checkpoint due dates (the contract is not negotiable and you will adhere to all activities set forth in the contract as defined by the assigned faculty member).

5. You will demonstrate didactic and clinical proficiency on all checkpoints delineated in the contract with a P (pass). A P is defined as receiving a score of 79.5 or better on the assigned checkpoint. You are reminded that no additional time is given for clinical performance activities, regardless of a documented disability. Extended time is only granted for written examinations. In the event that you will need to complete any written examinations during the remediation period, you are encouraged to contact Student Services now and obtain the required documentation.

6. Should you fail to receive a 79.5 on any component of the remediation course (PHAS 6000), remediation will culminate immediately. No further attempts will be allowed and you will receive an F (fail) as your final transcript grade.

(*Id.* ¶ 73 (citing Def. Exs. E, E-2, Letter from Dr. Steele-Moses to Plaintiff dated May 28, 2021).)

On May 30, 2021, Ward acknowledged her acceptance and understanding of the terms of the remediation by signing the acknowledgment on Dr. Steele-Moses letter, which stated:

I Cyndi Ward have received this dismissal determination and understand that all remediation activities assigned to me must be passed with a minimum score of 79.5 or better. Should I receive a score of 79.49 or below on any of the remediation checkpoints, I understand that the remediation period will stop and I will receive an F for the remediation class (PHAS 6000). If I receive a failing grade in PHAS 6000, I understand that my dismissal from the program will stand and no further appeals will be heard.

11

(*Id.* ¶ 74 (citing Def. Exs. E, E-2, Doc. 16-8).)

Plaintiff highlights differences between PHA5754 FCMCS V – Comprehensive Medicine and PHAS 6000—such as it being a 3 hour course rather than the 1 hour independent study—but Plaintiff does not dispute the facts highlighted above. (*See PCISMF* ¶ 1, Doc. 20-1.)[2]

### 5.  Summer 2021: The Remediation Course

On June 16, 2021, Dr. Deyo invited Ward to a "Remediation Planning Meeting." (*SUMF* ¶ 75, Doc. 16-1.)[3] The Remediation Planning Meeting occurred on June 18, 2021, with Ward, Dr. Deyo, and Dr. Michael McIntosh, who was an Assistant Professor and the Clinical Coordinator for the PA Program, present at the meeting. (*Id.* ¶ 75.) During the Remediation Planning Meeting, Dr. Deyo discussed the structure of the PHAS 6000 Independent Study course, provided Ward with the course syllabus, and explained the student-developed remediation contract as a part of which Plaintiff would be responsible for developing three learning goals based on a self-assessment. (*Id.* ¶ 76 (citing Def. Exs. A, A-11 Course Syllabus for PHAS 6000, Doc. 16-4).)

Following the Remediation Planning Meeting, Dr. Deyo informed Plaintiff that Mr. Michael Falba would serve as her faculty advisor for the remediation course. (*Id.* ¶ 77.) Ward worked with Mr. Falba to create her learning goals, which were submitted to Dr. Deyo and Dr. McIntosh on June 23, 2021. (*Id.* ¶ 78.)

Plaintiff complains that she requested Melissa Lemoine or Alicia Braud to "teach" the remediation course, that she was not told why they were not chosen, and that that she did not want

---

[2] When the *PCIMF* is cited alone, then that fact has either been admitted in the *DRPCIMF* or been qualified or denied in such a way as to have it be deemed admitted as not properly controverted, unless otherwise indicated. *See* M.D. La. Civ. R. 56(c), (f).

[3] Plaintiff complains that she had to reach out to Dr. Deyo about this meeting, but (a) Plaintiff does not provide a pinpoint citation to this fact, referring only to her combined submissions of her deposition excerpts (*see PCIMF* ¶ 2, Doc. 18-1 (citing Pl. Ex. 2)); (b) putting this aside, it is undisputed that, on May 28, 2021, FranU told Plaintiff by email that Dr. Deyo would contact her the week of June 14, 2021, to assign a full time faculty member who would work with her during PHAS 6000, (*SUMF* ¶ 73, Doc. 16-1 (citing Def. Ex. E, E-2, Letter from Dr. Steele-Moses to Ward dated May 28, 2021, Doc. 16-8)); and (c) in any event, this fact is not material to any issue in dispute.

Dr. Deyo because Dr. Deyo had previously given Plaintiff a "C." (*PCIMF* ¶ 3, Doc. 20-1; Pl. Ex. 2 at 49-50.) But it is undisputed that Ms. Lemoine and Ms. Braud were not full-time faculty members and did not teach the PHAS 5754 Foundations of Clinical Medicine and Surgery V, and, therefore, they were not qualified to supervise the remediation course and grade the assignments. (*SUMF* ¶ 79, Doc. 16-1.)

Plaintiff also stated that she did not want Dr. Deyo "teaching" her remediation course because Dr. Deyo had told Ward that Ward had a knowledge deficit. (Pl. Ex. 2 at 49–51, Doc. 19-2; *PCIMF* ¶¶ 4, Doc. 20-1.) Specifically, Plaintiff testified:

> I just specifically asked not have Dr. Deyo if possible because I had previously had Dr. Deyo for the course that I received a third "C" in, and I had already explained to Dr. Steele-Moses the discomfort I felt with Dr. Deyo because prior to this, the third semester of school, Dr. Deyo told me that I had a knowledge deficit which I thoroughly disagree with, and she told me that she did not expect me to pass the third semester of school, she did not expect me to make it to January, and when I made it to January, she told me she was very surprised to see me, and that I should feel lucky to still be in the program. And this was the same teacher who gave me my third "C."

(Pl. Ex. 2 at 50–51, Doc. 19-2.) Defendant qualifies this by relying on the undisputed facts, highlighted above, about Dr. Deyo's October 26, 2020, meeting with Plaintiff. (*SUMF* ¶¶ 38–43, Doc. 16-1.)

In any event, Ward was not repeating the entire PHAS 5754 Foundations of Clinical Medicine and Surgery V course. (*Id.* ¶ 80 (citing Def. Exs. A, A-12, Remediation Contract, Doc. 16-4).) Her remediation course, PHAS 6000, was a self-directed course that was designed for students to remediate specific content within a course. (*Id.* ¶ 81.) No other student had been given the opportunity to take PHAS 6000 in response to a program dismissal appeal. (*Id.* ¶ 82.) The course covered topics that were already taught. (*Id.* ¶ 83.) No additional teaching was required or

provided. (*Id.* ¶ 84.) Dr. Deyo, Dr. McIntosh, and Mr. Falba were available to Ward for assistance with the topics. (*Id.* ¶ 85.)

Plaintiff's Student Remediation Contract, which she signed on June 25, 2021, included the following schedule of Remediation Activities and Due Dates:

- Differential Diagnosis (3) – Week of June 28
- Remediation Foundation Exam Content – July 8
- OSLERs/H&P (x2) – Week of July 12

(*Id.* ¶ 86 (citing Def. Ex. A-12, Doc. 16-4).)

During the week of June 28th, Plaintiff was scheduled for three Differential Diagnosis assignments: Cough (June 28); Fatigue (June 29); and Rash (June 30). (*Id.* ¶ 87.) Ward informed Dr. Deyo and Dr. McIntosh that she was concerned about the pace of the course. (*Id.* ¶ 88.) The schedule of the course was designed to get Ward back into progression with her cohorts, who had already started their clinical courses. (*Id.* ¶ 89.) There was approximately one week between the end of the Spring 2021 semester and the beginning of clinicals. (*Id.* ¶ 90 (citing Def. Ex. C at 122, Doc. 16-6).) The remediation course was the sole course she was taking at that time, and she was only revisiting material previously taught. (*Id.* ¶ 91.)

Dr. Deyo and Dr. McIntosh graded the Differential Diagnosis assignments together on July 1, 2021. (*Id.* ¶ 92.) Ward earned 72% on Cough, 68% on Fatigue, and 90% on Rash. (*Id.* ¶ 93.)

On July 2, 2021, Dr. Deyo and Dr. McIntosh met with Plaintiff to review the results of the Differential Diagnosis assignments and resulting dismissal from the program. (*Id.* ¶ 94.) Ward was notified in writing of her failure to meet the benchmarks defined in the Remediation Contract and dismissal from the PA Program. (*Id.* ¶ 95 (citing Def. Ex. A-13, Letter from Dr. Deyo to Ward, Doc. 16-4).)

14

### C.  The Parties' Positions

According to Defendant, Plaintiff struggled through the entirety of her time at the PA Program. (*SUMF* ¶ 96, Doc. 16-1.) Ward failed multiple exams, even in courses in which she ultimately earned a "B" as a final grade. (*Id.* ¶ 97.) FranU emphasizes that Plaintiff was provided with an opportunity to continue in the PA Program, which no other student who had been dismissed from the PA Program had been afforded. (*Id.* ¶ 98.) Moreover, Ward admitted that errors by a PA can result in a patient's death. (*Id.* ¶ 99 (citing Def. Ex. C at 27, Doc. 16-6).) FranU says that it went above and beyond what it was required to do by allowing Plaintiff to take the Remediation Course and upon successful completion, continue in the PA Program with her cohorts. (*Id.* ¶ 100.)

Plaintiff, on the other hand, lodges a number of complaints about the process and the failure to accommodate. First, Plaintiff objects that the assignments were supposed to be graded one by one under the contract and that feedback would be provided between each, but FranU disputes this. (*Compare PCIMF* ¶ 8, Doc. 18-1, *with DRPCIMF* ¶ 8, Doc. 20-1.) The only evidence Plaintiff cites for this fact is the Remediation Contract itself, and, as Defendant notes, the contract did not state that the assignments would be graded "one by one." (*See* Def. Ex. A-12, Doc. 16-4.) To the contrary, it says only under the section "Remediation Activities & Due Dates," that "2. Differential Diagnoses (3) – Week of June 28." (*Id.* at 46.)

Second, Plaintiff complains that she had difficulty with the way FranU was conducted online during the COVID pandemic. (Pl. Ex. 2 at 54–56, Doc. 19-2.) But, all students faced this challenge during COVID, and, as was shown above, she was back in the classroom as of January 2021, before she earned her third "C." (*Id.*)

Third, Ward claims that there is a conflict of interest in this case. (*PCIMF* ¶ 9, Doc. 18-1.) Specifically, Plaintiff objects to Dr. Deyo's role as the teacher, the program director (who typically

reviews a grade appeal), and as an advisor. (Pl. Ex. 1 at 33, Doc. 18-2; *DRPCIMF* ¶ 9, Doc. 20-1.) But Defendant points out that it is undisputed that, because Dr. Deyo was Plaintiff's course instructor, another Program Director, Dr. Alicia Bates, reviewed Ward's grade appeal, denied that appeal, and found that the grade of 77% was supported. (*SUMF* ¶¶ 62–63, Doc. 16-1.) Defendant also highlights that, during the Remediation Course, Dr. Deyo *and* Dr. McIntosh and Mr. Falba were available to help Ward with topics, and Dr. Deyo *and* Dr. McIntosh graded Plaintiff's Differential Diagnosis assignments *together*. (*Id.* ¶¶ 85, 92.)

Fourth, Plaintiff attacks the remediation benchmarks, arguing that they lacked an objective grading system, but Defendant disputes this as well. (*Compare PCIMF* ¶ 10, Doc. 18-1, *with DRPCIMF* ¶ 10, Doc. 20-1.) Plaintiff points only to the syllabus for PHAS 6000 for support, yet the syllabus does not really speak either way on this issue. (*See* Pl. Ex. 3, Doc. 19-3.) Defendant, on the other hand, reiterates that the assignments in this course were jointly graded by Dr. Deyo and Dr. McIntosh. (*See DRPCIMF* ¶¶ 10–11, Doc. 20-1.)

Fifth, Plaintiff notes that, because the remediation course was only one-hour, she was not allowed to apply for financial aid for that course and had to pay for it out of pocket. (Def. Ex. C at 145, Doc. 16-6.) Defendant, however, correctly points out that this does not amount to competent summary judgment evidence that the decision to use a one-hour remediation course was done for discriminatory reasons. (*See DRPCIMF* ¶ 11, Doc. 20-1.)

Sixth, Plaintiff complains that she wasn't given enough time between tests during the remediation phase. (Pl. Ex. 2 at 54, Doc. 18-2.) Dr. Deyo rejected the request, saying that the "course schedule is what the course schedule is," and that the schedule was "set in stone" after being published." (*Id.* at 54–57.) While the differential diagnoses assignments had to be finished in just one week, they were "proctored examinations," and "the faculties [had] schedules with

other places, at other times, other responsibilities. So that schedule [was] based on [FranU's] proctor availability." (*Id.* at 58.) Dr. Deyo said that schedule is not rearranged for any course, unless there is an emergency. (*Id.*) Plaintiff had asked to change the course schedule, but Dr. Deyo said she did not know it was an ADA request because changing schedules of courses or assessments around is not a typical ADA request of students. (*Id.* at 60–61.) Dr. Deyo said, "In my seven years at the University, I've never seen the ADA office issue an accommodation saying, 'This student needs to be able to dictate the scheduling of assessments.'" (*Id.* at 61.) So, Dr. Deyo said she did not know. (*Id.*) Again, the school only offers time-and-a-half exams and a distraction-reduced environment for multiple choice exams as reasonable accommodations. (*Id.* at 62–63.)

Defendant responds that the Remediation Course schedule was described in the Remediation Contract, but that's not technically true; the Remediation Contract signed by Plaintiff simply said that the three Differential Diagnosis were to be conducted the "Week of June 28." (*SUMF* ¶ 86, Doc. 16-1.) However, it is undisputed that, during the week of June 28th, Ward was scheduled for three Differential Diagnosis assignments: Cough (June 28); Fatigue (June 29); and Rash (June 30). (*Id.* ¶ 87.) Moreover, it is also undisputed that the course was designed to get Plaintiff back into progression with her cohorts, who had already started their clinical courses. (*Id.* ¶ 89.)

Seventh, Plaintiff objects that she was told by Dr. Steele-Moses that she would have an eight-week in-person course for her independent study but it was in fact only four. (Pl. Ex. 2 at 47–50, Doc. 19-2.) Defendant responds, correctly, that Dr. Steele-Moses' letter to Ward (summarized above) did not say the course would be eight weeks, (Def. Ex. E-2, Doc. 16-8). Moreover, the Remediation Contract contained the course schedule, which spanned from June 21st

through the week of July 12th. (Def. Ex. A-12, Doc. 16-4.) Plaintiff signed both of these documents. (Def. Ex. E-2, Doc. 16-8; Def. Ex. A-12, Doc. 16-4.)

Eighth, Plaintiff asserts that she was "forced to draft two appeals at the same time as the instructions regarding appeal were unclear," which Defendant denies with various facts highlighted above describing the different appeals. (*See DRPCIMF* ¶ 15, Doc. 20-1.) But, putting aside Defendant's denials, Plaintiff fails to show how this is somehow reflective of discrimination.

And ninth, Plaintiff points to two alleged comparators, arguing that Plaintiff was treated less favorably, under nearly identical circumstances, than other similarly situated FranU students who were not members of her protected class. First, according to Plaintiff, Jackie Johnson told Plaintiff that she should have received a "B" in one of her courses but she was granted an "A" on her transcript. (Def. Ex. C at 88–90, Doc. 16-6.) Plaintiff said that Plaintiff had a 79.45, which was only 0.05 percent from a B. (*Id.*) Johnson, on the other hand, was 0.05 percent from an "A" in a similar course. (*Id.*)

But, as will be shown below, Plaintiff did not recall what course Johnson was involved in. (*Id.*) Moreover, for Johnson, the difference was between an "B" and an "A," not between a C," which might put her on probation, and a "B." (*Id.*) Lastly, Johnson was not involved in a remediation course (though Plaintiff said that shouldn't make a difference because Plaintiff was also not involved in a remediation course). (*Id.* at 90–91.)

Additionally, Plaintiff points to Annie Shockett; Ward testified that Shockett was white, received three "Cs," but was not dismissed from the PA Program. (Def. Ex. C at 138, Doc. 16-6.) Plaintiff said Shocktt failed the first semester, appealed the dismissal, and was granted the appeal by Dr. Steele-Moses. (*Id.* at 138–39.) But Plaintiff conceded that, though Shockett was allowed to repeat everything, Shockett denied the opportunity because she felt that things would not be

different the second time. (*Id.* at 139.) So, Shockett also received an academic dismissal. (*Id.*)

Defendant further responds, as reflected above, that (a) Plaintiff lacks competent summary

judgment evidence to support this fact; (b) Ward was given the opportunity to continue in the PA

Program, which no other student who had been dismissed from the PA Program was afforded; and

(c) Plaintiff did not successfully complete the Remediation Course which was offered to her.

(*SUMF* ¶¶ 82, 95, 98, Doc. 16-1.)

## II.   Relevant Standard

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). "The movant bears the initial burden and must identify 'those portions of the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'"

*Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted)).

If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent

must do more than simply show that there is some metaphysical doubt as to the material

facts. . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a

*genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–

87 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory

allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air*

*Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations and internal quotations omitted).

Ultimately, "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (cleaned up). Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991) (citations omitted).

## III.  DISCUSSION

### A.  ADA and Rehabilitation Act Claims

#### 1.  *Parties' Arguments*

##### a.  Defendant's Original Memorandum (Doc. 16-2)

Defendant begins by arguing that the Supreme Court has instructed lower courts to show great deference to the professional judgment of academic institutes in determining student qualifications, delinquencies, and dismissals. (Doc. 16-2 at 14–15.) According to Defendant, "the more specialized and individualized the educational regime, the more unique the student/faculty relationship becomes and the more deference an institution should be given when dismissing a student for academic reasons." (*Id.*) Here, FranU's PA Program was highly specialized, so FranU is entitled to deference. (*Id.*)

Defendant then turns to the Rehabilitation Act, arguing that "FranU provided her all of the accommodations that it was required to provide under [that statute] and under the PA Program's policies." (*Id.* at 15–17.) Defendant contends that: (a) Plaintiff cannot show that she was "otherwise qualified" for the PA Program or that Fran U failed to provide her with a reasonable accommodation, (*id.* at 17–19); (b) that Plaintiff's requested accommodations" were not

20

"accommodations" at all and were not reasonable requests for the PA Program, (*id.* at 19–21).

Specifically, Defendant maintains:

> (a) getting extra time for the clinical-based assignments would have fundamentally changed the PA Program and impacted future patient care and safety;
>
> (b) Plaintiff's argument that the grade of 79.45 should have been rounded up to 79.5 and then to 80 is nonsensical and not evidence of discrimination;
>
> (c) Plaintiff's objection to the remediation course being one hour or only three weeks ignores the facts that (i) no other student was given such an opportunity after being dismissed from the PA Program; (ii) the goal of the course was to ensure Ward had the foundational knowledge necessary to move into the clinical phase of the PA Program and to do it in the amount of time that would allow her to join her cohorts who had already started the clinical rotation, not to teach or re-teach Plaintiff any new information; and (iii) in any event, Ward did not successfully complete the remediation course as agreed to in the Remediation Contract.

(*Id.*) Even if Ward was qualified under the Rehabilitation Act, Plaintiff cannot demonstrate that FranU dismissed her from the PA Program *solely* based on her disability, as required by that statute; rather, Plaintiff has not rebutted the legitimate, non-discriminatory reason that she was dismissed for poor academic performance. (*Id.* at 21.)

Turning to the ADA, Defendant makes a lengthy argument that it is exempt from Title III of the ADA as a religious organization, (*id.* at 21–24) before asserting that, even if it is not exempt, Plaintiff's ADA claim fails for the same reasons as the Rehabilitation Act claim, (*id.* at 24–25). Again, Plaintiff cannot establish (a) that she was an otherwise qualified individual with a disability; (b) that FranU denied her a reasonable accommodation; and (c) that Plaintiff's disability was a "motivating factor" in her dismissal. (*Id.*) And, even if Plaintiff could establish the elements of its

ADA claims, she would only be entitled under the ADA to injunctive relief, not damages. (*Id.* at 25.)

b. Plaintiff's Opposition (Doc. 18)

Conversely, Plaintiff maintains she was dismissed from the program because she was denied several requests for a reasonable accommodation in violation of the ADA. (Doc. 18 at 1–2.) Plaintiff begins her argument by emphasizing that academic intuitions must comply with the ADA and Section 504 of the Rehabilitation Act. (*Id.* at 7–8.)

Plaintiff then asserts that there is direct evidence of discrimination because Defendant admits in briefing that "certain accommodations were not permitted." (*Id.* at 8.) Plaintiff disputes Defendant's claim that extra time could not be given in the clinical setting because (a) at the time of the request, there was no clinical setting; (b) Ward was not in a hospital but in a classroom environment; and (c) "no lives were remotely at risk or endangered." (*Id.* at 8–9 (citations omitted).) According to Plaintiff, if she had received her accommodation, she would have successfully completed the program and maintained her "B" average. (*Id.* at 9–10.) Ultimately, says Plaintiff, extra time does not fundamentally alter the nature of the program. (*Id.* at 10.)

Plaintiff also contends that she failed to receive a full accommodation in compliance with the ADA. (*Id.*) FranU cannot provide accommodations for some assignments but not others. (*Id.* at 11) Plaintiff should have been provided full accommodations (i.e., extra time) on all assignments. (*Id.*) FranU's denial creates a question of material fact that warrants denial of its motion. (*Id.*) Plaintiff cites a few cases purportedly in support of this. (*Id.*) Ward also attempts to distinguish two of Defendant's cases. (*Id.* at 12.)

Plaintiff next responds to Defendant's claim that it is exempt under the ADA as a religious organization. (*Id.* at 13.) Plaintiff maintains that, even if that's true, FranU is still subject to the Rehabilitation Act. (*Id.* at 13–14.)

Plaintiff then argues that Dr. Deyo did not want her to succeed in the program and was biased against her for her race and disability. (*Id.* at 14–15.) Plaintiff points to things Dr. Deyo purportedly said about Plaintiff's performance as evidence of ADA and Rehabilitation Act violations. (*Id.*) Plaintiff then discusses other purported problems, summarized above, in the factual background. (*Id.* at 15–16.)

### c.  Defendant's Reply Memorandum (Doc. 20)

Defendant replies that Plaintiff failed to meet her burden. (Doc. 20 at 1–2.) There is no evidence that FranU discriminated against Ward; rather, Ward was dismissed from the PA Program for a legitimate, non-discriminatory reason—poor academic performance—consistent with the Fran U's and the PA Program's policies. (*Id.*)

Defendant then emphasizes Plaintiff's burden in opposing a summary judgment motion: Plaintiff must come forward with competent evidence, not subjective beliefs and personal feelings. (*Id*. at 3.) FranU says Ward has not met her burden and has presented only "conclusory allegations, unsubstantiated assertions, improbable inferences, and unsupported speculation . . . ." (*Id.*)

Defendant next disputes Plaintiff's claim that it admitted to violating the law by not providing Ward with all the accommodations she requested. (*Id.* at 5.) Rather, FranU offered all accommodations required by the ADA and Rehabilitation Act. (*Id.*) Defendant was not required to make fundamental or substantial changes to its program or to lower its standards, and it did not need to "perfectly adhere to an individual's wishes regarding accommodations." (*Id.*) Defendant then pounds the facts again, reiterating that how important it is that clinical-based assignments

mirror the time constraints of real-world situations and how a student who cannot meet those conditions can be harmful to patients. (*Id.* at 6.)

Following this, Defendant argues that the Remediation Course was conducted in accordance with Dr. Steele-Moses's criteria and the Remediation Contract. (*Id.* at 6–7.) Here, FranU re-urges facts, highlighted above, about the Remediation Course. (*Id.*)

FranU then turns to case law. (*Id.* at 7.) First, FranU attacks two cases Plaintiff cited. (*Id.*) Defendant points out that neither of the cited cases stand for the propositions that Ward relies upon. (*Id.*) FranU then argues that two of the cases it cited are not distinguishable in the way Ward claims. (*Id.* at 7–8.)

### 2. Disability Discrimination

#### a. Applicable Law

"Although . . . the ADA and Section 504 of the Rehabilitation Act prohibit discrimination against qualified individuals with disabilities, 'the statutes govern different entities.'" *Shurb v. Univ. of Tex. Health Sci. Ctr. at Hous.-Sch. of Med.*, 63 F. Supp. 3d 700, 706 (S.D. Tex. 2014) (quoting *Kemp v. Holder,* 610 F.3d 231, 234–35 (5th Cir. 2010)). Title II of the ADA applies to public entities. 42 U.S.C. § 12131(1). Title III of the ADA prohibits discrimination in "any place of public accommodation," *id.* § 12182(a), including an "undergraduate, or postgraduate private school, or other place of education," *id.* § 12181(7)(J). Meanwhile, "[t]he [Rehabilitation Act] prohibits discrimination in federally-funded programs and activities." *Shurb*, 63 F. Supp. 3d at 706 (quoting 29 U.S.C. § 794(a)).

Still, "[t]he [Rehabilitation Act] and the ADA are judged under the same legal standards, and the same remedies are available under both Acts." *Id.* (quoting *Kemp*, 610 F.3d at 234–35 (citing *Delano–Pyle v. Victoria Cnty., Tex.,* 302 F.3d 567, 574 (5th Cir. 2002))). "Specifically,

Title II of the ADA provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" *Id.* (quoting 42 U.S.C. § 12132). Likewise, Title III of the ADA provides, "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). Similarly, "Section 504 of the Rehabilitation Act provides, in relevant part, that '[n]o otherwise qualified individual with a disability in the United States, . . . shall solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." *Shurb,* 63 F. Supp. 3d at 706 (quoting 29 U.S.C. § 794(a)).

The standards for establishing a claim under the ADA or Section 504 of the Rehabilitation Act are substantially similar "in the context of a student excluded from an educational program. . . ." *Id.* at 707 (quoting *Maples v. Univ. of Tex. Med. Branch at Galveston,* 901 F. Supp. 2d 874, 879–880 (S.D. Tex. 2012), *aff'd* 524 F. App'x 93 (5th Cir. 2013) (internal citations omitted)); *see also Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012) ("To the extent possible, we construe [Title III of] the ADA and Rehabilitation Act to impose similar requirements. . . . Thus, despite the different language these statutes employ, they require a plaintiff to demonstrate the same elements to establish liability." (citing, *inter alia*, *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 214 (4th Cir. 2002); *Bowers v. NCAA*, 475 F.3d 524, 535 n.12 (3d Cir. 2007))). Plaintiff must show that "(1) [s]he has a qualifying disability; (2) [s]he is qualified to participate in the defendant's program; and (3) [s]he was excluded from the

25

defendant's program due to [her] disability." *Shurb*, 63 F. Supp. 3d at 706 (citing *Maples*, 901 F. Supp. 2d at 879–880); *see also Halpern*, 669 F.3d at 461–62 (same).

"If a plaintiff can satisfy the prima facie elements, the burden shifts to the defendant to 'articulate some legitimate nondiscriminatory reason' for its actions." *Cohen v. Univ. of Texas Health Sci. Ctr.*, 557 F. App'x 273, 278 (5th Cir. 2014) (quoting *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir.1995) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981))); *see also Herzog v. Loyola Coll. in Maryland, Inc.*, No. 07-02416, 2009 WL 3271246, at *8 (D. Md. Oct. 9, 2009) (applying burden-shifting to Title III disability discrimination claim in academic setting). "If the defendant meets his burden and presents such a reason, then the burden shifts back to the plaintiff to show that the nondiscriminatory justification was mere pretext for discrimination . . . ." *Cohen*, 557 F. App'x at 278 (citing *Seaman v. CSPH, Inc.*, 179 F.3d 297, 300–01 (5th Cir. 1999); *see also Herzog*, 2009 WL 3271246, at *8.

"A plaintiff may demonstrate pretext 'by showing that the [defendant's] proffered explanation is unworthy of credence.'" *Cohen*, 557 F. App'x at 279 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (internal quotation marks and citation omitted)). "An explanation is false or unworthy of credence if it is not the real reason for the adverse . . . action." *Id.* (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)).

"The only material difference between Titles II of the ADA and Section 504 of the Rehabilitation Act] lies in their respective causation requirements." *Shurb*, 63 F. Supp. 3d at 707 (quoting *Bennett–Nelson v. La. Bd. of Regents,* 431 F.3d 448, 454 (5th Cir. 2005) (internal citations omitted)); *see also Halpern*, 669 F.3d at 461–62 (stating same with respect to Title III of the ADA and the Rehabilitation Act). "Section 504 of the Rehabilitation Act prohibits discrimination 'solely by reason of' a person's disability, whereas Title II of the ADA provides that 'discrimination need

not be the sole reason' for the adverse action or exclusion but rather 'a motivating factor.'" *Shurb*, 63 F. Supp. 3d at 707 (quoting *Pinkerton v. Spellings,* 529 F.3d 513, 516–19 (5th Cir. 2008)); *see also Halpern*, 669 F.3d at 461–62 (same for Title III and Rehabilitation Act). "Nevertheless, '[a] plaintiff asserting a private cause of action for violations of the ADA or the [Rehabilitation Act] may only recover compensatory damages upon a showing of intentional discrimination.'" *Shurb*, 63 F. Supp. 3d at 707 (quoting *Delano–Pyle,* 302 F.3d at 574 (citing *Carter v. Orleans Par. Pub. Sch.,* 725 F.2d 261, 264 (5th Cir. 1984))).

The Court also looks to employment cases to assess whether Ward was "treated less favorably, under nearly identical circumstances, than were other similarly situated" FranU students "who were not members of [her] protected class." *Cardiel v. Apache Corp.*, 559 F. App'x 284, 288 (5th Cir. 2014) (per curiam); *see also Maples*, 901 F. Supp. 2d at 880 (stating that plaintiff failed to prove disability discrimination "through the *McDonnell Douglas* burden shifting framework by, for example, showing that nondisabled students with similar academic performance were treated more favorably than she was."). By way of analogy, "[e]mployees are generally not similarly situated if they have different supervisors, different work responsibilities, work for different divisions of a company, committed dissimilar violations, or were the subject of adverse employment actions too remote in time from that taken against the plaintiff." *Cardiel*, 559 F. App'x at 288 (citing *Lee v. Kan. City S. Ry.*, 574 F.3d 253, 259–60 (5th Cir. 2009)). "Furthermore, if the 'difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer, the employees are not similarly situated for the purposes of an employment discrimination analysis.'" *Id.* (quoting *Lee*, 574 F.3d at 260 (emphasis in original) (citation and internal quotation marks omitted)). "In short, an employee who proffers a fellow employee as a comparator must 'demonstrate that the

employment actions at issue were taken under nearly identical circumstances' for 'nearly identical' conduct." *Id*. (quoting *Lee*, 574 F.3d at 260 (citation and internal quotation marks omitted)). That is, "in the context of a race [or disability] discrimination claim where the plaintiff alleges that employees who were not members of the protected class received more [favorable treatment], the plaintiff must come forward with *specific evidence* of comparators who were similarly situated." *Corley v. Louisiana ex rel. Div. of Admin., Office of Risk Mgmt*, 816 F. Supp. 2d 297, 316 (M.D. La. 2011) (emphasis added) (citing *Lee*, 574 F.3d at 259–60). Courts within the Fifth Circuit define "similarly situated" narrowly. *See Horton v. G4S Secure Sols. (USA), Inc.*, No. 16-544, 2018 WL 1997535 at *5 (M.D. La. Apr. 27, 2018) (citing *Brown v. Bd. of Trs. Sealy Indep. Sch. Dist.*, 871 F. Supp. 2d 581, 593 (S.D. Tex. 2012)).

Finally, in the context of employment cases, "it is well established that 'discrimination laws [are not] vehicles for judicial second-guessing of business decisions,'" *Amedee v. Shell Chem. LP-Geismer Plant*, 384 F. Supp. 3d 613, 636 n.168 (M.D. La. 2019), *aff'd sub nom. Amedee v. Shell Chem., L.P.*, 953 F.3d 831 (5th Cir. 2020) (citations omitted), and the same is true for academic settings:

> Federal law "does not mandate that an educational institution 'lower or [ ] effect substantial modifications of standards to accommodate a handicapped person,' assuming such standards are reasonable." *McGregor v. La. State Univ. Bd. of Supervisors,* 3 F.3d 850, 858 (5th Cir. 1993) (quoting *Southeastern Cmty. Coll. v. Davis,* 442 U.S. 397, 413 [ ] (1979)), *cert. denied,* 510 U.S. 1131 [ ] (1994).; *see also Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 225 n. 11 [ ] (1985) (quoting *Bd. of Curators, Univ. of Mo. v. Horowitz,* 435 U.S. 78, 96 n. 6 [ ] (1978) ("University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation.")). Absent evidence of discriminatory intent or disparate impact, reasonable deference must be accorded to an educational institution's academic decisions. *McGregor,* 3 F.3d at 859[ ] (internal citations omitted).

*Shurb*, 63 F. Supp. 3d at 709–10. "The question is not whether an employer [or, here, an academic institution] made an erroneous decision; it is whether the decision was made with discriminatory motive." *Amedee*, 384 F. Supp. at 636 n.168 (citations omitted); *see also Shurb*, 63 F. Supp. 3d at 709–10. "Plaintiff's subjective belief that she was discriminated against based on her disability . . . is insufficient to create a genuine issue of material fact for trial." *Amedee*, 384 F. Supp. at 636 n.168.

b.  <u>Analysis</u>

Having carefully considered the matter, the Court will grant Defendant's motion on the discrimination claims. First, Plaintiff has failed to establish a prima facie case of discrimination; she was not qualified to participate in the program, and she was not excluded from the program due to her disability.

The undisputed evidence (detailed extensively above) shows that the purpose of PHAS 5754 Foundations of Clinical Medicine and Surgery V was to equip students with the knowledge and clinical ability necessary to competently practice in a primary care setting. (*SUMF* ¶¶ 48–49, Doc. 16-1.) As the syllabus for this course stated, "In the clinical phase, and in practice, the PA must be able to perform tasks, procedures, and made [sic] decisions in a variety of clinical settings with a finite amount of time, and often under stress. These abilities and behaviors have a direct effect on patient safety and outcomes." (*Id.* ¶ 50 (emphasis omitted).) The course prepares PA students for real-time practice and critical decision-making and the skills that are part of the Technical Standards, and it is imperative that PA students successfully meet the benchmarks on clinical-based assignments within the time determined by the course instructor as that is what would be required in practice. (*Id.* ¶¶ 52–53; Def. Ex. A-6, Doc. 16-4.) Despite these requirements,

Plaintiff received a "C" in the course—her third—thus failing to meet the requirements of the PA Program. (*SUMF* ¶ 57, Doc. 16-1.)

Then, even though it was not required, FranU gave Ward a final opportunity to continue in the PA Program upon the successful completion of the Remediation course, and she specifically acknowledged by signature that a score of 79.49 or lower would result in her receiving a failing grade and the dismissal from the program. (*Id.* ¶¶ 73–74.) Again, it is undisputed that no other student had been given the opportunity to take PHAS 6000 in response to a program dismissal appeal, and the course covered topics already taught and was designed for students to remediate specific content within a course. (*Id.* ¶¶ 81–83.) Notwithstanding her agreement, she still failed to satisfactorily complete two of her three assignments. (*Id.* ¶¶ 92–93.)

Under the circumstances, the Court finds that, even construing the evidence in a light most favorable to Plaintiff and drawing reasonable inferences in her favor, no reasonable juror could conclude that Plaintiff was "qualified to participate in the defendant's program" or that " [s]he was excluded from the defendant's program due to [her] disability." *Shurb*, 63 F. Supp. 3d at 707 (citation omitted); *see also Halpern*, 669 F.3d at 466–67 ("Where a professional school has reasonably determined based on an identifiable pattern of prior conduct that a student is unfit to join his chosen profession, federal law does not obligate the school to allow that student to remain in and graduate from its educational program."). On this basis alone, Defendant's motion could be granted.

But, even if Plaintiff had established a prima facie case, Defendant has offered a legitimate, non-discriminatory reason for Ward's dismissal: her poor academic performance. Thus, it was incumbent on Plaintiff to show that Defendant's justification was "not the real reason for the adverse [ ] action" but either (a) that it was caused solely because of discrimination (under the

Rehabilitation Act) or (b) that discrimination was a motivating factor (under the ADA). *See Cohen*, 557 F. App'x at 279; *Shurb*, 63 F. Supp. 3d at 707.

Plaintiff has failed to meet this burden. The Court has reviewed Ward's various complaints about her dismissal (detailed above), and the Court finds that a reasonable factfinder could not conclude that discrimination was a motivating factor in FranU's dismissal of Plaintiff, and certainly could not find that discrimination was the sole reason for the adverse action. To take one example, Plaintiff complains that Dr. Deyo had ill will toward her, but, again, it is undisputed that (a) because Dr. Deyo was Plaintiff's course instructor, another Program Director, Dr. Alicia Bates, reviewed Ward's grade appeal, denied that appeal, and found that the grade of 77% was supported, (*SUMF* ¶¶ 62–63, Doc. 16-1), and (b) during the Remediation Course, (i) Dr. Deyo *and* Dr. McIntosh and Mr. Falba were available to help Ward with topics, and (ii) Dr. Deyo *and* Dr. McIntosh graded Plaintiff's Differential Diagnosis assignments *together*, (*id.* ¶¶ 85, 92). Thus, Plaintiff cannot prevail on this argument.

Other complaints, such as her course being only an hour, her grade not being rounded up, her course being only four weeks rather than eight, or the fact that she did not receive enough time between assignments, are either contradicted by Dr. Steele-Moses' letter, which Plaintiff signed, or are issues which she could have but did not incorporate into the letter or Remediation Contract. (*Id.* ¶ 73–76). That is to say, these objections amount to nothing more than subjective beliefs that she was discriminated against rather than substantial evidence of pretext, and that is insufficient to create a question of fact for trial. *See Amedee*, 384 F. Supp. 3d at 636 (citation omitted).

Finally, the Court finds that Ward has not provided "specific evidence of comparators" who were treated differently under "nearly identical circumstances." *Cardiel*, 559 F. App'x at 288; *Corley*, 816 F. Supp. 2d at 316. Plaintiff points to two comparators: (1) Jackie Johnson, who was

given an "A" even though she received a "B," (Def. Ex. C at 88–90, Doc. 16-6); and (2) Annie Shockett, who received three "Cs" but was not dismissed, (Def. Ex. C at 138–39, Doc. 16-6.)

Preliminarily, the Court agrees with FranU that Plaintiff has not presented competent evidence to support these facts. *See Barnett v. La. Dep't of Health*, No. 17-1793, 2023 WL 2467876, at *3 (M.D. La. Mar. 10, 2023) (deGravelles, J.) (explaining that affidavit testimony "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated" and that, while "all knowledge is inferential, . . . the inferences and opinions must be grounded in observation or other first-hand personal experience" and "must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience." (citations omitted)). Here, Plaintiff provides no basis for knowing what these other two students' situations were, or even a basis from which the Court could infer such knowledge.

But, putting that aside and assuming the truth of Plaintiff's testimony, Plaintiff has failed to establish that these two students were proper comparators. With respect to Johnson, whose grade was raised from a "B" to an "A," (a) Plaintiff could not recall what course Johnson was involved in; (b) more importantly, Johnson was not involved in a remediation course; and (c) most importantly, there is a considerable difference between raising from a "B" to an "A" than from a "C" to a "B," as the latter involves probation and the former does not. (Def. Ex. C at 88–90, Doc. 16-6.) Likewise, Plaintiff identifies Annie Shockett as someone who received three "Cs" but was not dismissed, but (a) Shockett was allowed to repeat her courses but ultimately chose not to; and (b) Plaintiff was given an opportunity to continue the PA Program upon the successful completion of the remediation course, but she failed to do so. (Def. Ex. C at 138–39, Doc. 16-6; *SUMF* ¶¶ 82, 95, 98, Doc. 16-1.)

Thus, Johnson and Shockett's situations are too dissimilar to Plaintiff's to be proper comparators. That is, the "difference between the plaintiff's conduct and that of [the students] alleged to be similarly situated *accounts* for the difference in treatment received from" FranU, so the students are "not similarly situated for the purposes of [a] [ ] discrimination analysis." *Cardiel*, 559 F. App'x at 288 (quoting *Lee*, 574 F.3d at 260 (emphasis in original) (citation and internal quotation marks omitted)). Without more, Plaintiff has not met her burden of "com[ing] forward with *specific evidence* of comparators who were similarly situated," particularly given the fact that "the Fifth Circuit defines 'similarly situated' narrowly." *Santos v. Baton Rouge Water Works Co.*, No. 18-1098, 2021 WL 1227875, at *17 (M.D. La. Mar. 31, 2021) (deGravelles, J.) (citing, *inter alia*, *Corley*, 816 F. Supp. 2d at 316; and then citing *Horton*, 2018 WL 1997535 at *5).

In sum, "[t]he plaintiff does not identify any evidence establishing that [her] disability was a motivating factor in [FranU's] decision to remove [her] from its [PA P]rogram." *Shurb*, 63 F. Supp. 3d at 708. "Instead, the record demonstrates that the University's removal of the plaintiff was consistent with its performance requirements and was made only after numerous attempts to reasonably accommodate the plaintiff's disability." *Id.* (citing *Shaboon v. Duncan*, 252 F.3d 722, 731 (5th Cir. 2001) (reasoning that the dismissal of a medical student due to concerns about the student's mental health and fitness to perform as a doctor combined with the student's failure to provide a certification of fitness from his treating psychiatrist constituted "a sound academic basis for dismissal."); *see also Maples*, 901 F. Supp. 2d at 880 ("Instead, the undisputed summary judgment evidence shows that UTMB's exclusion of Maples was consistent with its performance requirements and made only after multiple attempts to reasonably accommodate her disability failed." (citing *Hamilton v. Sw. Bell. Tel. Co.*, 136 F.3d 1047, 1052 (5th Cir. 1998) (affirming summary judgment in ADA case because undisputed evidence established that the plaintiff was

33

fired for misconduct, not because of his PTSD))). Consequently, Defendant's motion will be granted, and Plaintiff's discrimination claims under the ADA and Rehabilitation Act will be dismissed.

### 3. *Alleged Failure to Accommodate*

#### a. <u>Applicable Law</u>

Additionally, "[u]nder Title II [of the ADA] and the [Rehabilitation Act], discrimination by a public entity includes failing to make reasonable modifications or accommodations [for] the disabled individual, so that [he] can participate in the programs or activities provided by the public entity." *Id.* at 708 (citing *Aragona v. Berry*, No. 10–1610, 2012 WL 467069, *10–11 (N.D. Tex. Feb. 14, 2012) (internal citations omitted)); and then citing 28 C.F.R. § 35.130(b)(7); and then citing 34 C.F.R. § 104.44(a)). Likewise, under Title III of the ADA, "discrimination" is defined to include "'a failure to make reasonable modifications' that are 'necessary' to provide a disabled individual with such full and equal enjoyment [of public accommodations], 'unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.'" *Halpern*, 669 F.3d at 461 (quoting 42 U.S.C. § 12182(b)(2)(A)(ii)).

"The plaintiff, however, bears the burden of requesting reasonable accommodations." *Shurb*, 63 F. Supp. 3d at 708–09 (citing *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007) (citing *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 n.4 (5th Cir. 1999))). "Once a qualified individual with a disability requests reasonable accommodations, 'the public entity has an obligation to engage in an "interactive process" to determine the best means of accommodating the plaintiff's disability.'" *Id.* at 709 (quoting *Aragona*, 2012 WL 467069 at *10 (citing Loulseged,

178 F.3d at 735)); *see also Halpern*, 669 F.3d at 466 (explaining how defendant did not violate

interactive process requirement for Title III claim).

"While the ADA does provide a right to reasonable accommodation, it does not, however,

mandate that a plaintiff be given his or her *preferred* accommodation." *Id.* (citing *E.E.O.C. v. Agro*

*Distrib., LLC*, 555 F.3d 462, 471 (5th Cir. 2009) (emphasis added)). Again, as the *Shurb* court

explained:

> The process of obtaining and creating reasonable accommodations
> in the academic setting differs from that in the employment setting.
> For instance, under the Rehabilitation Act, a school is required to
> "make such modifications to its academic requirements as are
> necessary to ensure that such requirements do not discriminate or
> have the effect of discriminating, on the basis of handicap, against a
> qualified handicapped applicant or student." 34 C.F.R. § 104.44(a).
> Such "[m]odifications may include changes in the length of time
> permitted for the completion of degree requirements, substitution of
> specific courses required for the completion of degree requirements,
> and adaptation of the manner in which specific courses are
> conducted." *Id.* Likewise, under the ADA, a school is required to
> "make reasonable modifications in policies, practices, or procedures
> when the modifications are necessary to avoid discrimination on the
> basis of disability . . . ." 28 C.F.R. § 35.130(b)(7).
>
> Nonetheless, under no circumstances is the University required to
> provide accommodations that would "fundamentally alter the nature
> of the service, program, or activity" and need not alter eligibility
> criteria that are "shown to be necessary for the provision of the
> service, program, or activity being offered." 28 C.F.R.
> § 35.130(b)(7)-(8); *see also Maples,* 901 F. Supp. 2d at 883. Federal
> law "does not mandate that an educational institution 'lower or [ ]
> effect substantial modifications of standards to accommodate a
> handicapped person,' assuming such standards are reasonable."
> [*McGregor,* 3 F.3d at 858 (quoting *Davis,* 442 U.S. at 413)].; *see*
> *also* [*Ewing,* 474 U.S. at 225 n.11 (quoting *Horowitz,* 435 U.S. at 96
> n.6)] ("University faculties must have the widest range of discretion
> in making judgments as to the academic performance of students
> and their entitlement to promotion or graduation.")). Absent
> evidence of discriminatory intent or disparate impact, reasonable
> deference must be accorded to an educational institution's academic
> decisions. *McGregor,* 3 F.3d at 859[ ] (internal citations omitted).

*Shurb*, 63 F. Supp. 3d at 709–10.

b. Analysis

Having carefully considered the matter, the Court will grant Defendant's motion on this issue as well. In sum, all reasonable jurors would conclude that Ward's various desired accommodations would "fundamentally alter the nature of the service, program, or activity" and "alter eligibility criteria that are shown to be necessary for the provision of the service, program, or activity being offered." *Id.* at 709.

The Court need not repeat all of the undisputed evidence outlined above in the Factual Background and Disability Discrimination sections. To briefly recap, Plaintiff was given a reasonable accommodation (additional time and a distraction-free environment) for the didactic portion of the PA Program. (*SUMF* ¶¶ 8, 10, 35–37, Doc. 16-1.) But, the clinical parts of the PA Program required Plaintiff to perform in real-world situations where actions must often be taken with time constraints. (*See id.* ¶¶ 21–23, 48–53.) And there was a good reason for these requirements; as Plaintiff admitted, errors by a PA can result in a patient's death. (*Id.* ¶ 99 (citing Def. Ex. C at 27).) The Court agrees with FranU's assessment that it went above and beyond what it was required to do by allowing Ward to take the remediation course and upon successful completion, continue in the PA Program with her cohorts, (*id.* ¶ 100), particularly in light of the deference the Court must give the institution in making academic decisions, *see Shurb*, 63 F. Supp. 3d at 709–70.

As in *Shurb*, "[t]he undisputed evidence in the record demonstrates that [FranU] complied with the ADA and the Rehabilitation Act in providing the plaintiff with reasonable accommodations when [s]he timely requested them," and even with accommodations when they were not requested. *Id.* at 710. "However, in spite of the accommodations provided by the

University, the plaintiff was unable to perform at the required level and failed to comply with the University's policies . . .", *id.*, with Dr. Steele-Moses's letter, or with the Remediation Contract. (*See* Def. Ex. A-12, Doc. 16-4; Def. Ex. E-2, Doc. 16-8.) "The federal disability discrimination laws mandate only the right to reasonable accommodations for qualified individuals with disabilities; they do not provide an automatic right to a plaintiff's preferred accommodations or unfettered admission/access to the plaintiff's chosen educational institution." *Shurb*, 63 F. Supp. 3d at 710.

For all these reasons, Defendant's motion will be granted. Plaintiff's claim that FranU failed to offer a reasonable accommodation will be dismissed with prejudice. (*Id.*)

### B. Title VI and Fourteenth Amendment

#### 1. Parties' Arguments

Defendant then turns to Plaintiff's Title VI claim and argues that Ward cannot establish intentional race discrimination. (Doc. 16-2 at 27.) Defendant maintains that it dismissed Plaintiff for a legitimate, non-discriminatory reason (poor academic performance), and Plaintiff cannot prove that its actions were motivated by race, particularly given the fact that FranU went above and beyond its policies by giving her the opportunity of a remediation course. (*Id.*) With respect to the Fourteenth Amendment, Defendant urges that it is a private institution, not a state actor, and therefor its conduct is not "fairly attributable to the State." (*Id.* at 27–28.)

Plaintiff responds that she was discriminated against because of her race and treated differently than Johnson and Shockett. (Doc. 18 at 16–17.) Moreover, the Fourteenth Amendment applies to higher education. (*Id.*)

Defendant replies that Plaintiff has failed to put forward competent summary judgment evidence proving her Title VI or Fourteenth Amendment claim. (Doc. 20 at 9.) Plaintiff's only

"proof" are the above two comparators, but Plaintiff fails to establish that she has personal knowledge regarding their grades. (*Id.*)

## 2. Law and Analysis

"Title VI of the Civil Rights Act of 1964 provides that '[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.'" *Bisong v. Univ. of Hous.*, 493 F. Supp. 2d 896, 904–05 (S.D. Tex. 2007) (quoting 42 U.S.C. § 2000d). "The Supreme Court and the Fifth Circuit have held that a private right of action exists under Title VI only for violations involving intentional discrimination." *Id.* (citing *Guardians Ass'n v. Civ. Serv. Comm'n of City of N.Y.,* 463 U.S. 582, 103 S. Ct. 3221, 3235 n.27 (1983)). "The court's 'inquiry into intentional race [or national origin] discrimination is essentially the same for individual actions brought under . . . Title VI and Title VII." *Id.* (quoting *Baldwin v. Univ. of Tex. Med. Branch at Galveston,* 945 F. Supp. 1022, 1031 (S.D. Tex. 1996), *aff'd* 122 F.3d 1066, 1997 WL 464467 (5th Cir.1997)).

Additionally, "[t]he Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *Normore v. Dall. Indep. Sch. Dist.*, 677 F. Supp. 3d 494, 524 (N.D. Tex. 2023) (quoting *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982))). "The Fifth Circuit has explained that § 1983 and Title VII are 'parallel causes of action.'" *Id.* (quoting *Lauderdale v. Tex. Dep't of Crim. Just., Institutional Div.*, 512 F.3d 157, 166 (5th Cir. 2007)). "Furthermore, the 'inquiry into intentional discrimination is essentially the same for individual actions brought under sections 1981 and 1983, and Title VII.'" *Id.* at 524 n.18 (quoting

*Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996)). "To establish a violation of the Equal Protection Clause in the employment context, a plaintiff must prove a discriminatory purpose or motive." *Id.* at 525.

"Plaintiffs in these types of cases may rely on either direct or circumstantial evidence, or both." *Bisong*, 493 F. Supp. 2d at 905 (citations omitted). As with the ADA and Rehabilitation Act claims, if Plaintiff relies on circumstantial evidence, the Court employs the *McDonnell Douglas* burden-shifting analysis. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 93 S. Ct. 1817, 1824 (1973)); *Normore*, 677 F. Supp. 3d at 525–26 (citation omitted). If the plaintiff establishes a prima facie case, and if the defendant offers a legitimate, nondiscriminatory reason, the plaintiff must meet its ultimate burden of persuasion on the issue of intentional discrimination. *Bisong*, 493 F. Supp. 2d at 905. "A plaintiff may meet this burden by producing evidence tending to show that the reason offered by the defendant is not true but, instead, is a pretext for discrimination." *Id*. (citing *McDonnell Douglas*, 93 S. Ct. at 1825).

Finally, the deference Courts give to universities in academic decisions for ADA and Rehabilitation Act claims applies with equal force to Title VI claims:

> Cases that question academic decisions made by universities require courts to balance the rights of students against the school's "legitimate interests . . . in preserving the integrity of [its] programs." [*Alexander v. Choate*, 469 U.S. 287, 105 S. Ct. 712, 720 (1985)]. Because "[c]ourts are particularly ill-equipped to evaluate academic performance," [*Horowitz*, 98 S. Ct. at 956], courts accord great deference to a school's determination. *See also* [*Ewing*, 106 S. Ct. at 513] ("When judges are asked to review the substance of a genuinely academic decision . . . they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment."); *Levi v. University of Texas at San Antonio,* 840 F.2d 277, 280 (5th Cir. 1988) ("To the extent a decision concerning a teacher's or student's academic performance requires 'an expert evaluation of cumulative

information,' it lends itself poorly to judicial review.").

*Bisong*, 493 F. Supp. 2d at 905–06.

Here, Plaintiff has failed to meet her burden. Even assuming that Plaintiff had made a prima facie case, Defendant has offered a nondiscriminatory reason for dismissing plaintiff: her poor academic performance. The only evidence Plaintiff offers in response are the alleged comparators. But, as shown above: (a) Plaintiff does not have competent evidence to support this, and (b) even putting that aside, the purported comparators are too dissimilar from Plaintiff's situation to demonstrate pretext. Consequently, for all of the reasons given above, Defendant's motion will be granted, and Plaintiff's Title VI and Fourteenth Amendment claims will be dismissed with prejudice.

## IV. CONCLUSION

Accordingly,

**IT IS ORDERED** that the *Motion for Summary Judgment* (Doc. 16) filed by Defendant Franciscan Missionaries of Our Lady University is **GRANTED**, and all claims by Plaintiff Cydni Ward against Defendant are **DISMISSED WITH PREJUDICE.**

Signed in Baton Rouge, Louisiana, on September 20, 2024.

_____
**JUDGE JOHN W. deGRAVELLES
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**